RECEIVED

JUN 03 2013

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Case No. 13CV1312 PJS/JSM

David B. Triemert,

**Plaintiff,**

v.

Washington County and
Sheriff William Hutton and
Chief Deputy Sheriff Dan Starry and
Commander Cheri Dexter and
Sheriff's Deputy Nick Sullivan and
Lake St. Croix Beach Mayor Tom McCarthy and
John Doe(s) and
Jane Doe(s),

**Defendant(s).**

**Complaint for Immediate
Injunctive Relief, Declaratory
Judgment, U.S. Constitution
Violations, Money Damages**

**DEMAND FOR
JURY TRIAL**

/

SCANNED

JUN 03 2013

U.S. DISTRICT COURT ST. PAUL

# COMPLAINT

PLAINTIFF David B. Triemert, is suing Defendants for injunctive relief, declaratory judgment, and money damages and says:

# JURISDICTION

1. This is an action for money damages in excess of $75,000.00.

2. At all times material to this lawsuit, Plaintiff, David B. Triemert lived in Washington County, Minnesota.

3. At all times material to this lawsuit, Defendants to the best of Plaintiff's knowledge were residents of the State of Minnesota.

4. All acts necessary or precedent to the bringing of this lawsuit occurred or accrued in the State of Minnesota.

5. Violations of Plaintiff's Fourth Amendment Rights to the United States Constitution, and under common law of the State of Minnesota, give this Court jurisdiction.

6. Violations of Plaintiff's Fifth Amendment Rights to the United States Constitution, and under common law of the State of Minnesota, give this Court jurisdiction.

7.    Violations of Plaintiff's Fourteenth Amendment Rights to the United States Constitution, and under common law of the State of Minnesota, give this Court jurisdiction.

8.    Defendants willful violation of 42 U.S.C. 1983 against Plaintiff, with relief brought pursuant to 42 U.S.C. 1988 give this Court jurisdiction.

9.    Jurisdiction is based upon 28 U.S.C. 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law pursuant to 28 U.S.C. 1367.

10.   This Court has jurisdiction.

# PARTIES

11.   Plaintiff, David B. Triemert, is an individual representing himself, and he lives and may be served notice at 2965 Lake Elmo Avenue N. Lake Elmo, MN 55042. Plaintiff, David B. Triemert is hereinafter referred to as "Plaintiff", or "Triemert".

12.   Defendant, Washington County, is a municipal corporation and the public employer of Defendants: Sheriff William Hutton, Chief Deputy Sheriff Dan Starry, Commander Cheri Dexter, Deputy Nick Sullivan. Defendant Washington County is sued directly and also on the theories of respondeat superior or vicarious liability and pursuant to Minn. Stat. (466.02), for the actions of its officers and officials, including Deputy Sullivan, and other

Washington County Sheriff Deputies yet to be identified and added to a new Amended Complaint. Defendant, Washington County maintains offices in Stillwater Minnesota and may be served at 14949 62nd Street North, Stillwater, MN 55082. Defendant, Washington County, is hereinafter referred to as "Washington County", or the "County", or "Defendant."

13.   Defendant, William Hutton was at all times relevant to this complaint the elected and acting sheriff of Washington County Sheriff's Office, acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Minnesota and or Washington County. Defendant William Hutton is being sued individually, and in his individual and official capacities, with offices located in Stillwater, Minnesota, he may be served at his principal place of business: Washington County Sheriff's Office, 15015 62nd Street North, Stillwater, MN 55082. William Hutton is hereinafter referred to as "Mr. Hutton", "Hutton", "Sheriff", the "Washington County Sheriff", or "Defendant."

14.   Defendant, Dan Starry was at all times relevant to this complaint the appointed Chief Deputy Sheriff and acting chief deputy sheriff of Washington County Sheriff's Office, acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Minnesota and or Washington County. Defendant Dan Starry is being sued individually, and in his individual and official capacities, with offices located in Stillwater, Minnesota, he may be served at his principal place of business: Washington County Sheriff's Office, 15015 62nd Street North, Stillwater, MN 55082. Dan Starry is hereinafter referred to as "Mr.

4

Starry", "Dan Starry", "Washington County Chief Deputy Sheriff", or "Defendant."

15.   Defendant, Nick Sullivan, (the arresting officer) whose first name may be other than "Nick" was at all times relevant to this complaint a duly appointed and acting Deputy Sheriff of Washington County Sheriff's Office, acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Minnesota and or Washington County. Defendant Nick Sullivan is being sued individually, and in his individual and official capacities, with offices located in Stillwater, Minnesota, he may be served at his principal place of business: Washington County Sheriff's Office, 15015 62nd Street North, Stillwater, MN 55082. Nick Sullivan is hereinafter referred to as "Mr. Sullivan", "Deputy Sullivan", "Washington County Deputy Sheriff", or "Defendant."

16.   Defendant, Cheri Dexter, was at all times relevant to this complaint a duly appointed and acting Deputy Sheriff Commander of Washington County Sheriff's Office, acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Minnesota and or Washington County. Defendant Cheri Dexter is being sued individually, and in her individual and official capacities, with offices located in Stillwater, Minnesota, she may be served at her principal place of business: Washington County Sheriff's Office, 15015 62nd Street North, Stillwater, MN 55082. Cheri Dexter is hereinafter referred to as "Ms. Dexter", "Dexter", "Washington County Deputy Commander", or "Defendant."

17.   Defendant, Tom McCarthy, was at all times relevant to this complaint the elected Mayor in the City of Lake St. Croix Beach, and acting as the Mayor in the City of Lake St. Croix Beach, acting under local statutes, ordinances, regulations, policies, customs, and usages of the City of Lake St. Croix Beach or State of Minnesota, in Washington County. Defendant Tom McCarthy is being sued individually, and in his individual and official capacities, with offices located in Lake St. Croix Beach, Minnesota, he may be served at his principal place of business: 16455 20th Street S.  Lake St. Croix Beach MN 55043. Tom McCarthy is hereinafter referred to as "Mr. McCarthy, "Mayor McCarthy", "Mayor", "Tom McCarthy", or "Defendant."

# FACTS

18.   On May 29, 2013, at approximately 5:30 p.m., Plaintiff was traveling home from work alone in his private automobile, northbound on St. Croix Trail in St. Croix Beach, Minnesota, when he noticed two Washington County Sheriff patrol vehicles parked in close proximity in opposite directions where it appeared that the two drivers were in conversation with each other at the intersection of or about 21st street and St. Croix Trail.

19.   Plaintiff passed the two squad cars and continued on his way home.

20.   A minute or two later, Plaintiff noticed that one of the squad cars was coming up close behind him, and then noticed that a second squad car was behind the first squad car. Plaintiff then observed the squad car directly behind him activate his emergency lights.

21.  In this particular stretch of road, it serves as a single lane highway having a narrow gravel shoulder; traffic travels in both directions.

22.  Unsure if Plaintiff was in the path of 2 squad cars responding to an emergency call up ahead of him, or the subject of their declared emergency, Triemert acknowledged the squad car driver behind him with a wave of his hand and looked for a safe place to pull off the road and get out of their way.

23.  Traveling at approximately 50 or 55 miles per hour, Plaintiff continued up the highway approximately a quarter mile or half mile to the nearest gravel driveway on his right hand side of the road where he carefully pulled into the parking lot of a pizza restaurant and stopped and proceeded to roll down his window a few inches. And then looking in his mirror, Triemert noticed that Deputy Sullivan was already out of his car and walking up the side of Triemert's automobile.

24.  Deputy Sullivan asked Plaintiff for driver's license, registration, and proof of insurance. Triemert replied, "What for? I'm not Driving!"

25.  The definition of "Driving", in the United States Transportation Code from which all state transportation codes are derived refers to persons who are licensed by occupation and operating a motor vehicle in commerce engaged in the commercial purposes of hauling  freight/ cargo or passengers or both.

26.  Triemert was not "Driving", or operating a "motor vehicle", or engaged in any commercial activity or purpose in the hauling of freight or passengers,

when he was unlawfully stopped and abducted by Deputy Sullivan on a public roadway.

27. Triemert then preceded to hand Deputy Sullivan 2 sheets of paper stapled together through the open window. The top sheet was a Private Property Notice to Law Enforcement Officers (Exhibit A).

28. The second Sheet of paper was a copy of Triemert's Notice to the State of Minnesota Removing a Motor Vehicle from Jurisdiction of This State (Exhibit B).

29. Deputy Sullivan glanced at the 2 sheets of paper Triemert had handed him and then pushed them back towards Triemert and yelled for Triemert to roll the window all the way down. Triemert, having studied many cases and videos of police brutality over the past few years feared for his own personal safety at this point because Deputy Sullivan had become very irate and aggressive in dealing with Triemert.

30. When Sullivan stepped back to get the night stick out of his utility belt, Triemert told Sullivan that he was calling 911 to request a supervisor come out there to help manage the stop, and he then rolled his window up just far enough to still hear the Deputy, and then dialed 911.

31. When Deputy Sullivan raised his night stick while demanding Triemert get out of the automobile, Triemert complied and was jerked out and shoved up against his automobile, with his cell phone connected to the 911 call for assistance falling to the ground.

32.   Deputy Sullivan then jammed his hand in Triemert's left front pocket and asked Triemert if he had any drugs on him. Triemert repied "no, I don't do drugs". He forcibly removed Triemert's a pack of credit cards, folded bills of money and driver's license.

33.   Deputy Sullivan then asked Triemert a series of other questions while placing Triemert in handcuffs and then into the back seat of his squad car.

34.   Triemert then refused to answer any further questions or cooperate with any tests that Sullivan wanted to perform on Triemert.

35.   Triemert then asked Deputy Sullivan why he got pulled over, and Sullivan responded "because of the blue license plates.

36.   Triemert then asked Sullivan what he was being arrested for, Deputy Sullivan responded "Obstruction of Legal Process".

37.   Deputy Sullivan ended up filing a total of eight charges against Triemert, of which was reduced to a total of 6 charges a few days later: 3rd Degree Chemical Test Refusal, 4th Degree DUI-Alcohol, Obstruct Legal Process, Expired Registration, Failure to Provide Proof of Insurance, Failure to Yield Right of Way to an Emergency Vehicle .

38.   At the request of Sullivan, Triemert's automobile was towed away by Stillwater Towing.

39.   Triemert's Notice to Law Enforcement Agencies contained a Standing Objection to any search, seizure, detainment, or theft of his private property and automobile, and demanded that they needed to get a warrant. Sullivan either didn't read said statement, or refused to honor Triemert's standing objection and in turn chose instead to violate Triemert's civil rights.

40.   Triemert had sent copies of said Notice To Law Enforcement by U.S. Mail on or around March 10, 2013, to Sheriff Hutton, Chief Deputy Dan Starry, Commander Cheri Dexter, and to eight police chiefs in Washington County, and the Minnesota State Patrol as a courtesy, and as proactive move to avoid any liability that their officers would incur if they were to unlawfully stop, detain, or arrest, or steal Triemert's property while he was traveling in his private automobile.

41.   Said Notice offered the recipient the opportunity to object in writing to Triemert with any concerns or potential legal ramifications of Triemert's stated intentions or actions. Not one person or agency named above ever responded to date in any way or objected to Triemert declaring said Right or for taking action on it.

42.   Triemert was brought to jail by Deputy Sullivan.

43.   On the way to jail, Sullivan appeared to cool down and get himself back under control. Triemert then felt comfortable asking him a number of questions during the ride to jail.

44.   Triemert asked Sullivan if he still had his personal recorder on. Sullivan
      replied that it was still on.

45.   Triemert asked Sullivan if he had ever been up to Triemert's website,
      WashingtonCountyCorruption.Com. Sullivan stated that he had in fact been
      up to it once or twice.

46.   Triemert asked Sullivan if he knew the difference between a motor vehicle
      and an automobile. He did not answer Triemert. People over the years have
      actually received patent rights to an automobile, yet no one has yet to
      receive a patent for a "motor vehicle". A motor vehicle is a "fiction", similar
      to a corporation, or person, being a fiction.

47.   Triemert told Sullivan a number of times that his private truck was not a
      "Motor Vehicle". Sullivan didn't seem to understand or want to understand
      what Triemert was stating or claiming.

48.   Triemert also asked Sullivan if Sheriff Hutton put him up to the task of
      dragging Triemert through the mud and into jail. He responded asking me if
      I really thought that Sheriff Hutton was that "vindictive"; implying that
      Hutton may be acting vindictive towards me to at least some degree, most
      likely in return for all of the public corruption I've linked Sheriff Hutton to
      over the past two years.

49.   At some time during the ride to jail, Sullivan brought up an event that
      appeared to personally anger him; Triemert attended a recent City Council
      Meeting At Lake St. Croix Beach that Sullivan would normally attend to

report to the mayor on the sheriff's activities for the month but he didn't, apparently because of Triemert's presence, and wanting to avoid any questions from local residents about Triemert's bright blue message plates that Triemert displays on the front and rear bumper of his automobile as a courtesy to the curious and concerned.

50.     The text on Triemert's message/I.D. plates reads: Private Property – Not a Motor Vehicle under jurisdiction of Minn. Stat. 168/ 169 or U.S. Code 18-31, or "This State". The Bottom line reads, WashingtonCountyCorruption.Com

51.     Triemert had his message plates made up through an automobile dealer accessory print shop online. The cost of said plates was greater than what it would have cost Triemert to buy new registration tabs which do not even expire until June 2013. Triemert was not trying to save money by getting his own plates.

52.     Triemert installed his plates on or around March 10, 2013, after notifying the State of Minnesota that he was returning his motor vehicle title and license plates to them, and canceling any contracts or agreements with the State whether physical or implied, and removing his Automobile from the jurisdiction of this State. The Minnesota Department of motor Vehicles accepted the plates and title and they were required to then update their records accordingly.

53.     In the course of traveling around Washington County in his private automobile for the past two and a half months Triemert has encountered

numerous passing's of Washington County Sheriff patrol cars, at intersections, stop signs, stop lights, commercial parking lots, restaurants, gas stations, city hall meetings, courthouses; and never once received so much as a dirty look or stare from any Washington County sheriff's deputy, or city police officer. In fact, they made it a point not to look in his direction or to make eye contact, as if directed by a superior not to take notice.

54.  Triemert's unspoken live-and-let-live understanding with the local deputies seems to have shifted to the negative and began to deteriorate when he learned a few weeks ago of the Washington County Sheriff's Office wanting to add a new Sheriff's substation into the Lake St. Croix Beach City Hall building. Triemert was publicly opposed and was quite vocal with his concerns with the sheriff's office moving down there into what seemed to be an serious safety hazard to the residents, verses remaining at the roomy and wide open Lake St. Croix Beach Fire Department property.

55.  About two weeks before Triemert's unlawful arrest, Triemert made a Public Data Request with the City of Lake St. Croix Beach requesting all available information on the proposed move of the Substation but never received any such data. Triemert connected the willful refusal and neglect by the City of St. Croix Beach to provide said data as an outright obstruction to Triemert being able to learn all the details from any negotiations that had taken place in public or behind closed doors regarding said substation.

56.  At the May 20, 2013 Lake St. Croix Beach City Council Meeting, Triemert arrived a few minutes ahead of the general public and legally parked on the shoulder of the road in front of Lake St. Croix Beach City Hall.

57.   Triemert sat there for a few minutes finishing up a phone call when he
      noticed Lake St. Croix Beach Mayor, Tom McCarthy walking towards his
      truck.

58.   Mayor McCarthy appeared quite nervous and asked Triemert if he would
      mind parking around the corner on the next street over. Triemert agreed and
      then moved to a makeshift parking area to the north of City Hall.

59.   Mayor Tom McCarthy was not fond of Triemert's blue courtesy plates and
      him being parked at the main entry way to City Hall. Triemert has
      information and belief that Mayor McCarthy was a party to and instrumental
      in getting Triemert set up for the unlawful traffic stop by his
      communications with Deputy Sullivan and others. Triemert was pulled over
      by Deputy Sullivan about 30 minutes after he crossed paths with Mayor
      McCarty near City Hall.

60.   Triemrt alleges that Mayor McCarthy, after seeing Triemert in the area,
      notified Deputy Sullivan, or the Washington County Sheriff's Department
      about Triemert being the area with his truck displaying the blue courtesy
      plates.

61.   Deputy Sullivan and another Washington County Sheriff's Deputy believed
      by Triemert to be Deputy Volk were seen a few minutes thereafter lying in
      wait, most likely for Triemert to pass by so that they could pull him over and
      get him and his truck off the road to satisfy certain individuals, including
      McCarthy.

62.   When Triemert arrived at the Washington County Jail, he was taken in and put through the initial booking process. He was then placed inside a common area holding room that contained four rows of hard plastic seats, carpeting, a TV, collect call telephones and a bathroom.

63.   The room was very cold and Triemert fought to get comfortable and stay warm. Triemert remained in that room from approximately 7p.m. until about 3:30 a.m waiting to get booked into the main jail. During this time he ended up lying on the dirty carpeting trying to go to sleep with his sweatshirt pulled up over his head breathing the warm air onto his upper body and blocking out the overhead lighting and sounds of the TV.

64.   Triemert, 53 years old, experienced severe lower back and neck pain and suffered physical discomfort and had trouble sleeping on the hard floor. At some point, Triemert couldn't take it anymore and knocked on the glass to get someone's attention. A guard opened the door and asked what Triemert needed.

65.   Triemert told him he wanted to get booked into jail and get a bed and blankets. A woman guard at the desk asked if he was ready to answer some questions. Triemert quizzed her on the reason for such a question and she responded that the arresting officer told her that Triemert refused to answer any of his questions hours earlier.

66.   Triemert was booked into the jail and transferred to the fourth floor, but not before being required to take a breath alcohol test. Triemert complied in

15

order to get a bed and the test came back at zero percent alcohol. Triemert denies ever being "Intoxicated" at any time before or during the traffic stop, or at any time thereafter.

67.   Triemert further argues that even if he had been drinking or "Intoxicated" as the State contends that he was, Triemert was not subject to any of the alcohol related Minnesota Statutes in Chapter 169 as he was not driving, operating, or engaged in commercial activities, or in control of a motor vehicle when he was stopped; especially so being that he had not harmed anyone or any property.

68.   Triemert woke up that morning expecting to see a judge. Instead he spent the next 24 hours with a group of the most hardened criminals in the county jail awaiting trial or court hearings. Triemert believes that he was put with that group on purpose under the direction of Sheriff Hutton, as none of the other people booked in that night were roomed there.

69.   Triemert ordered Canteen right after lunch, but it didn't come through that day. The next day he was transferred down to general population. He inquired about his canteen order and was told it would be brought down.

70.   Triemert learned just after breakfast that he would be seeing a judge that morning, on Day 3, or May 31.

71.   Triemert was sent up to a courtroom holding cell at about 10a.m. that morning. He sat alone in a cold room for one and a half hours. At about 11:30a.m. Triemert used the intercom to ask about his court appearance. The

woman on the other end stated that he was going to be sent back down to his room and the judge would see him sometime after lunch. Triemert informed the woman that they only have 36 hours to get him in front of a judge or they would have to set him free. She responded that the judge makes the rules and he would see Triemert after lunch.

72.    Approximately 15 minutes after that conversation, Triemert was instructed by intercom to go back downstairs for lunch. Triemert informed the house guard back in general population that he still hadn't received his canteen supplies and would probably be getting out soon after seeing the judge that afternoon. She then checked into Triemert's order and informed him that they were out of the things he ordered and offered another package of goods. Triemert requested he be given a phone card instead. She convinced him to take the other package of goods.

73.    At approximately 1:30 p.m., Triemert was called out to attend court. He was directed to go upstairs. He was placed back into the same cold room where he then sat unattended to for about a half hour.

74.    At about 2 p.m. a woman came in to talk with Triemert and stated that she was a volunteer attorney that she would help him present his case, or know what to say to the judge. After a few minutes of her asking him about his case and then his telling her how he intended to move the court to dismiss the entire case because it was without probable cause from the very start, she became physically unnerved and said that they each view the law very differently and that she could not be of any help to him.

75. Triemert then asked her what judge he was going in front of. She replied, "Chief Judge, John Hoffman". Triemert was astounded at the remote possibility of going before Hoffman on a warm summer Friday afternoon when most people in his position are out playing golf.

76. Triemert told the woman in the room with him that he had a big problem going before Hoffman because Triemert had filed 8 criminal charges against Judge Hoffman in 2011; and Triemert had Hoffman recuse himself from hearing a civil case that Triemert was a party to in 2012; and that Triemert just received a letter from Hoffman a few days prior to his arrest where Hoffman refused to file 42 new criminal charges that Triemert made against various county officials/ officers; and that Triemert was in the process of writing a Judicial Conduct Complaint against Hoffman for interfering with the 42 new criminal charges that Triemert had divvied up and sent off to seven Washington County Judges; and wherein Hoffman responded for all seven judges stating that no action would be taken and that Triemert's Sworn Criminal Complaints with Verifications were not appropriate.

77. Triemert then appeared before Judge Hoffman, and was ordered to be released on his own recognizance.

78. Triemert was then sent back downstairs to his room in general population where he informed the guard that he was free to go. The guard told Triemert that it would be at least a few hours before he would be processed out and to wait in his cell. Triemert then asked about his canteen order, he was told he'd receive it on the way out. Triemert never did receive it, or compensation for it to the best of his knowledge.

79.    After sitting in his room for an hour or so with the housing section on lockdown, Triemert began to have serious doubts about getting out of jail before midnight and then having no money or cell phone to call anyone. Triemert lives about 5 or more miles from the county jail.

80.    Another hour passed with no word of release so Triemert called the guard on the intercom and asked for a couple of Grievance Forms. The guard on the other end asked what he needed them for and he respectfully explained that the matter was his personal business. The guard told him to wait a minute and then she came back on a few seconds later and told him to pack up and come out of the room. Triemert was released on May 31st, at about 4 p.m.; after having been deprived of the unalienable right to enjoy his life, liberty, and pursuit of happiness; spending a total of 45 hours behind bars.

81.    At all times during the events described above, the Defendants were engaged in a joint venture. The individual Defendants' assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during the said events.

82.    While detained at the Washington County Jail, Triemert experienced significant emotional trauma and distress:

83.    First, reliving the experience of being stalked, setup,  then unlawfully pulled over, assaulted, arrested, kidnapped, falsely charged, slandered, defamed, libeled, publicly humiliated,  and then jailed by an un-informed and grossly

negligent sheriff's deputy who was completely ignorant to Triemert's
unalienable Right to Travel freely upon the land unencumbered, and
unfettered, was emotionally difficult and traumatizing for Triemert.

84. Second, while Triemert was in jail, he had a constant worry about his wife
Maria, who is from another country and who still has trouble communicating
in the English language and is deathly afraid of the Police State presence,
and her being home alone with their two children and being subjected to a
no-knock search warrant on Triemert's home by the Washington County
Sheriff's Office S.W.A.T. team in retaliation against Triemert for publicly
announcing his political views and findings against Washington County
officials and officers on his website WashingtonCountyCorruption.Com;
now that Triemert was caged up in the county jail. As a result, Triemert
suffered significant emotional trauma and distress.

85. As a result of Defendants' actions, David Triemert was stalked, setup,
unlawfully pulled over, assaulted, arrested, kidnapped, falsely charged,
slandered, defamed, libeled, publicly humiliated,  and then jailed by an un-
informed and grossly negligent sheriff's deputy who was completely
ignorant to Triemert's unalienable Right to Travel freely upon the land
unencumbered, and unfettered. Said actions of Defendants' caused Triemert
to suffer significant emotional trauma and distress.

86. Said actions of all Defendants has created a false public record of arrest,
D.U.I. and other offenses for which Triemert will have to live under the
scrutiny of for the rest of his life. As a result, Triemert now suffers
significant emotional trauma and distress from this event.

87. As a result of Defendants' actions, Triemert was unlawfully detained at the Washington County Jail and deprived of life, liberty, and the pursuit of happiness.

88. As a result of Defendants' actions, Triemert was charged with a number of crimes and will incur legal expenses. Triemert intends to have all charges against him dropped at his next court hearing, at which hearing he will file criminal charges against certain Defendants named in this case with the Washington County Prosecutor or walk them over to the grand jury.

89. Triemert also had to come up with $482.00 in order to retrieve the property stolen from him at the traffic stop, when he had his private automobile returned to him from the impound lot four days after getting out of jail.

90. As a result of Defendants' unlawful actions, Triemert's Minnesota Class A Commercial Driver's License has been revoked for a term of one year on his initial refusal to test for alcohol. He can no longer operate a big truck, or drive any motor vehicle should his private automobile break down.

91. As a result of Defendants' actions, Triemert has suffered significant emotional and psychological injuries including depressed mood, anxiety, humiliation, and frustration while being held in jail; adding to his existing injuries of Legal Abuse Syndrome.

92. As a result of Defendants' actions, Triemert is unable to travel freely on the public roads and go to work in absence of the fear of what Deputy Sullivan

or others in law enforcement may do to Triemert if they see him on the road in his private automobile again before an injunction or declaratory judgment can be issued by this Court clarifying and acknowledging Triemert's right to travel upon the public roads in his private automobile.

93.    As a result of Defendants' actions, Triemert's new distrust in law enforcement officials and officers in general, and Defendants Hutton, Starry, Dexter, Sullivan, and Volk, in particular, this experience has impacted the quality of Triemert's life and where he now feels compelled or even forced to instill his distrust of law enforcement into his children for their own safety.

# INJURIES SUFFERED

94.    As a direct and proximate result of the said acts of the Defendants, Plaintiff David B. Triemert has suffered or continues to suffer the following injuries and damages:

a.  Violation of his constitutional right to travel freely upon the land in his private automobile;

b.  Violation of his constitutional right to be free from unreasonable searches and seizures of his person under the Fourth Amendment to the United States Constitution;

c.  Violation of his constitutional right to be free from unreasonable searches and seizures of his private property under the Fourth Amendment to the United States Constitution;

d.  Unlawful confinement for approximately 45 hours;

e. Emotional trauma and suffering;

e. Impound fees;

f. Lost wages from confinement

g. Lost wages from the inability to go to work.

95. The actions of Defendant violated the following clearly established and well settled federal constitutional rights of Plaintiff David Triemert:

a. The right to travel freely upon the land unencumbered and unfettered in his private automobile;

b. Freedom from unreasonable searches of his person and property;

c. Freedom from unreasonable seizures of his person and property;

# CLAIMS FOR RELIEF

96. Paragraphs 1 through 95 are incorporated herein by reference as though fully set forth.

## COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT VIOLATION AGAINST ALL DEFENDANTS

97. Based on the above factual allegations, all Defendants, through their actions, acting in collusion and or under the color of state law, violated Mr. Triemert's constitutional right to travel freely upon the land in his private automobile, depriving him of the Right to Life, Liberty, and the Pursuit of Happiness as is afforded everyone through the Declaration of Independence, and the Fourteenth Amendment of the United States Constitution, and

protected by 42 U.S.C. 1983. Specifically, the Defendants violated
Triemert's Fourteenth Amendment rights and 42 U.S.C. 1983 when they:

(1) Planned, conspired, and organized to remove Triemert and his private
automobile from any further use on the public roads,

(2) stopped Triemert without lawful authority or probable cause,

(3) searched Triemert's person and private automobile without a warrant,

(3) arrested Triemert without cause,

(4) imprisoned Triemert in the Washington County Jail.

98. As a result of these constitutional violations, Mr. Triemert suffered damages as
aforesaid.

## COUNT II: 42 U.S.C. § 1983 – UNREASONABLE SEIZURE AND ILLEGAL ARREST AGAINST INDIVIDUAL DEFENDANTS

99. Paragraphs 1 through 98 are incorporated herein by reference as though fully
set forth.

100. Based on the above factual allegations, Defendant Deputies Sullivan and
Volk, through their actions, acting under the color of state law, violated Mr.
Triemert's constitutional right to remain free from unreasonable seizures under the
Fourth Amendment to the United States Constitution when they seized, arrested,
and booked Mr. Triemert into the Washington County Jail, all without a warrant
and without lawful authority or probable cause to believe that Mr. Triemert had
committed a crime.

101. As a result of these constitutional violations, Mr. Triemert suffered damages
as aforesaid.

**COUNT III: 42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATION AND UNREASONABLE SEIZURE AGAINST WASHINGTON COUNTY**

102. Paragraphs 1 through 101 are incorporated herein by reference as though fully set forth.

103. Prior to May 29, 2013, Defendant Washington County developed and maintained policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons in Washington County, which caused the constitutional violations of Mr. Triemert's rights.

104. It was the policy and/or custom of Washington County to inadequately supervise and train its employees, including Defendant Deputies Sullivan and Volk, thereby failing to adequately discourage further constitutional violations on the part of its employees.

105. These policies and/or customs were the cause of the violations of Mr. Triemert's constitutional rights alleged herein.

**COUNT IV: FALSE IMPRISONMENT UNDER MINNESOTA STATE LAW**

106. Paragraphs 1 through 105 are incorporated herein by reference as though fully set forth.

107. Based on the above factual allegations, Defendant Deputies Sullivan and Volk falsely imprisoned Mr. Triemert. Specifically, Defendant Deputies Sullivan and Volk intended to confine Mr. Triemert when they arrested him and booked him into the Washington County Jail, all without probable cause or other legal justification. As a result of the Defendant Deputies' unlawful arrest, Mr. Triemert

was actually and unlawfully confined, and Mr. Triemert was aware that he was being unlawfully confined by the Defendant Deputies.

108. As a direct and proximate result of this false imprisonment, Mr. Triemert suffered damages as aforesaid.

## COUNT V:   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS UNDER MINNESOTA STATE LAW

109.  Paragraphs 1 through 108 are incorporated herein by reference as though fully set forth.

110. Based on the above factual allegations, Defendant Officers Sullivan and Volk inflicted intentional emotional distress upon Mr. Triemert. Specifically, Defendant Officers engaged in intentional or reckless conduct that was extreme and outrageous when the Defendant Officers pulled over Mr. Triemert without justification while he was traveling down the road minding his own business, and then threatening to break his window, assaulted him when jerking him out of the car, and then taking him to jail; charging him with eight offenses all of which are bogus. The Defendant Officers' conduct caused Mr. Triemert to suffer severe physical, emotional, and psychological distress.

111. As a direct and proximate result of this intentional infliction of emotional distress, Mr. Triemert suffered damages as aforesaid.

## COUNT XI: AGGREVATED ASSAULT AGAINST DEPUTY DEFENDANTS SULLIVAN AND VOLK

112. Paragraphs 1 through 111 are incorporated herein by reference as though fully set forth.

113. Based on the above factual allegations, Defendant Officers Sullivan and Volk assaulted Mr. Triemert. Specifically, Defendant Officers engaged in wrongful, malicious, unlawful, and intentional conduct intended to put Mr. Triemert in immediate, imminent, and direct fear and apprehension of an offensive touching by the Defendant Officers when the Defendant Officers while each carrying a loaded sidearm and Taser, and pulled Triemert from his private automobile and slammed him up against the side of it then rummaging through his pockets without warrant or justification before placing him in handcuffs and stuffing him in the back seat of Sullivan's squad car.

114. As a direct and proximate result of this assault, Mr. Triemert suffered damages as aforesaid.

## COUNT XII:   VIOLATION OF PLAINTIFF"S FIFTH AMENDMENT RIGHTS (AS INCORPORATED THROUGH THE STATES THROUGH THE FOURTEENTH AMENDMENT)

115. Paragraphs 1 through 114 are incorporated herein by reference as though fully set forth.

116. The conduct of the Defendants in depriving Triemert of his right to travel, his private property, and personal freedom, and mode of locomotion without due process of law constitutes a violation of Plaintiff' rights under the 5th Amendment to the United States Constitution, as incorporated to the States through the 14th Amendment.

117. The Defendants owed Triemert a duty under the 5th and 14th Amendments not to violate his rights under the United States Constitution as a common law

citizen of the United States. The Defendants' overt acts denied him due process of law by various communications among Defendants to deprive Triemert of his private property and right to travel in his private automobile.

118. The conduct of the Defendants to participate in a conspiracy to deprive Triemert of his property and right to travel in his private automobile, was an obvious interference with his 5th Amendment rights.

119. Plaintiff relied in good faith that Hutton, Starry, and Dexter would instruct their deputies to act legally and ethically in any encounters with Triemert but they failed to do so out of contempt for Triemert's free spirit and his exersize of his right to travel freely upon the land unencumbered.

120. The illegal and unethical conduct of the Defendants constitutes denial of Plaintiff' due process rights under the 5th and 14th Amendments to the United States Constitution.

121. The Defendants breached their duty owed Triemert and willfully deprived him of his property, personal freedom, and right to travel freely upon the land unencumbered.

122. As a direct and proximate result of this violation, Mr. Triemert suffered damages as aforesaid.

## COUNT XIII: CIVIL CONSPIRACY AND OR COLLUSION

123.  Paragraphs 1 through 122 are incorporated herein by reference as though fully set forth.

124. The aforementioned conduct of all of the Defendants to communicate and participate in the conspiracy to deprive Triemert of his private automobile, personal freedom, and right to travel freely unencumbered upon the land constitutes civil conspiracy and/or collusion.

125. By all Defendants participating in the communications involving the conspiracy to falsely arrest and or deprive Triemert of his right to travel and private property, the Defendants acted with the intent of engaging in illegal and unethical activity having full knowledge that such acts were substantially certain to result in injury and detriment to Triemert, his family, and his cause to travel freely upon the land, constitutes civil conspiracy and/or collusion.

126. The conduct of the Defendants in conspiring to deprive Triemert of his rights and property and personal freedom while aimed at destroying Triemert financially, and ruining his family relationships constitutes civil conspiracy and/or collusion.

127. The conduct of all of the Defendants set forth herein constitutes civil conspiracy and/or collusion.

128. As a direct and proximate result of this conspiracy, Mr. Triemert suffered damages as aforesaid.

# RELIEF REQUESTED

WHEREFORE, the Plaintiff requests that this Court grant the following relief:

a. Issue a declaratory judgment declaring that Defendants violated Plaintiff's Fourth Amendment right to be free of unreasonable search and seizure of his person and property;

b. Issue a declaratory judgment declaring that Defendants violated Plaintiff's Fourteenth Amendment right allowing him to travel freely upon the land unencumbered in his private automobile;

c. Issue a declaratory judgment declaring that Defendants violated Plaintiff's Fifth Amendment right by depriving him of due process;

d. Issue an order granting Plaintiff judgment against Defendants, finding that Defendants committed the tort of false arrest and that Defendants are liable to Plaintiff for all damages resulting from this violation;

e. Award of compensatory damages to Plaintiff against all Defendants, jointly and severally;

f. Award of punitive damages to Plaintiff against all Defendants, jointly and severally;

g. Award of reasonable attorney's fees and costs to Plaintiff pursuant to 42 U.S.C. § 1988;

h. Issue injunctive relief ordering that Washington County Sheriff's Deputies in particular, and law enforcement agencies within this Court's jurisdiction cease from any unlawful activity that interferes with Triemert's right to travel freely and unencumbered upon the land in his private automobile;

i. Award of such other and further relief as this Court may deem appropriate.


PLAINTIFF, DAVID B. TRIEMERT, HEREBY DEMANDS A JURY TRIAL.

Plaintiff designates St. Paul, Minnesota as the location for the trial in this matter.

Respectfully submitted,

David B. Triemert
2965 Lake Elmo Avenue N.
Lake Elmo, MN 55042
Phone:  (651) 248-7725

By _David Triemert_
David B. Triemert, *pro se*